The next case that we have on our schedule is 19-2140 Martin v. City of Albuquerque. Mr. Adler, if I pronounce that correctly, if you would begin, please introduce yourself and begin. Yes, Your Honor. Tim Adler and Jasmine Johnston on behalf of the appellant, the City of Albuquerque. My goal today will be to address a number of issues. The District Court's grant of summary judgment should be reversed for two reasons. First, the District Court's narrow tailoring analysis was too strict. And second, the District Court ignored material disputed facts. They failed to construe the facts in the light most favorable to the city as the non-movement. And I will address these issues a little bit in a moment. The second reason I will address here, Your Honors, comes from the long-standing standard on intermediate scrutiny that comes from Ward and was repeated in McCullen and in this court's opinions in Evans and McGrath. And that is that the ordinance must not burden substantially more speech than is necessary to further the government's legitimate interests. And this requirement demands a close fit between ends and means. But close fit does not mean perfect fit. Regulation need not be the least restrictive or least intrusive means, and its validity does not turn on a judge's agreement concerning the most appropriate method of promoting the government's interests. And the city would like to urge the court to consider context in terms of sort of the landscape of First Amendment cases. And in that regard, we're urging that the court consider that roadway safety cases are a different context and justify erring a little bit more on the side of caution. In this case, the District Court recognized the inherent danger of pedestrians standing in close proximity to high-speed traffic. And that foreseeable danger is a real and concrete harm, even without a record, any record of accidents, although we have that record in this case. But not with ramps, right? Actually, Your Honor, sadly, just last week, we had an accident. Let me ask it a different way. In the summary judgment record that was presented to the district judge, and it's on review here, was there any evidence of any of the accidents associated with an entrance or an exit of a highway ramp? Not any that involved pedestrians, Your Honor. That's true. There was some evidence about the dangers of high-speed traffic on those ramps, particularly on the off-ramps. And the district court posited that maybe off-ramps aren't quite as dangerous as on-ramps, where drivers are accelerating to get onto the freeway. But in fact, the news report showed that drivers are still driving at freeway speeds as they get off the freeway and try to make that intersection. And unfortunately, that appears to be what happened last week when a pedestrian was killed while sitting on a median at one of those ramps. Let me inquire about the less restrictive means analysis and where that fits into the equation of narrow tailoring. Do you perceive McGraw, our recent case, McGraw, to be consistent with Evans in postulating what that role would be for the less restrictive means analysis? And if not, where is any gap between those two? Your Honor, I think it is consistent because, and the answer to that, I think, is found in Evans' discussion of the less restrictive means analysis. Evans talked about McCullen and talked about how McCullen did not change the rule in Ward, talking about regulation being substantially broader than necessary. And I think what we glean from that is when an ordinance, sort of at the outset, appears to be reasonably well tailored to the harm it's trying to prevent, we don't necessarily need to get into a less restrictive means analysis. Well, then why in McGraw did the court seem to criticize Oklahoma City for not at least considering less restrictive means in making its determination as to the fit and the satisfaction of that fit with the First Amendment? I think that's because the court saw right at the outset that on the face of the ordinance, it wasn't narrowly narrowed. The ordinance was looking strictly at medians in a certain roadway that had a certain speed limit, looking only at the concept of speed kills. But what the ordinance didn't do, like the ordinance did in Evans, is consider median width. And so this sort of unidimensional approach that Oklahoma City took, took, I presumptively not a well tailored approach. But that's not the language. The court didn't use that language. I know the passage you refer to in your supplemental brief, the court didn't use that sort of presumptive language. And what I'm trying to struggle with, to understand is how that would be an administratable rule. I mean, are we supposed to say that on its face, this doesn't, this is not narrowly tailored, and therefore, we don't need to look at less restrictive means? I mean, how does one determine what is narrowly tailored, unless you know what other options are available? It just seems to be necessarily, that's part and parcel of how one would determine that, wouldn't it? I think the court in Evans certainly agreed that the less restrictive means analysis can be a useful part of the analysis. It used the word helpful. Yes. It can be a helpful part of the analysis. Certainly. But I think, and as we pointed out in our reply brief, there is kind of two separate avenues of consequences when we go through these inquiries. The substantially broader than these regulations, and the court has recognized that in other cases. I think when you go through that inquiry and determine that, at least at first blush, the ordinance appears to be broader than necessary, then you can shift to the other inquiry, which is, are there alternatives that burden substantially less speech, but are equally effective? And I think that's what that does. And Ward kind of warned about this, is it does invite kind of a limitless possibility, only limited by the judicial imagination of what the different alternatives could be. And that starts to slide into what looks more like a strict scrutiny analysis. Well, it does. Well, one could argue that it does. But but the point would be that, why wouldn't it be part of as, as, as lacrosse suggested, the obligation in satisfying narrow tailoring to at least point out that the obvious alternatives we considered and they weren't sufficient to address the need. And in other words, in this situation, when I looked at the reply brief, and your supplemental brief referred back to the reply brief, the supplement, the reply brief seemed to place the onus on the plaintiffs to identify less restrictive means. And why if that's not their burden, right? Absolutely, it isn't. It is not their burden. Well, if it's not their burden, then what how did? Well, let me ask in two ways. I take it based upon your statement so far, that that that it is not necessary, in every case to undertake a less restrictive means analysis. That's, that would be your view, right? I think that's true. And it would be sort of on a sliding scale. I think the first portion of the analysis does. Well, let's assume then for the moment, departing from that, that that lacrosse lesson to us is that Albuquerque at least need to needed to consider less restrictive means. What case or authority could you point us to that would suggest what Albuquerque did was sufficient to satisfy that burden? I would point right to Evans, Your Honor. And the reason for that is Evans looked specifically at looked specifically at the narrow tailoring that the city did there in determining that a three foot wide median ban was appropriate. And that was based on anecdotal reports of close calls. And it was based on basically city officials going out to these medians and determining whether they were were dangerous. And it also was based on the fact that Mr. Evans could walk down the same median and engage in his speech in a wider portion of the median. What Albuquerque has done, and I think what is critical in this case to focus on, is it's identified we began with the broader pedestrian safety problem, which is, of course, serious in Albuquerque, but it didn't end there. It focused on a specific, specific areas where these problems could come up. And so in evaluating FIT, we have to look at what each subsection is actually aiming to do. Well, before you before you get into A, B, and C, I want to stick on this issue that Judge Holmes is inquiring about. So in your answer focusing back on Evans and your distinction that in Evans, there was anecdotal evidence that the police chief and others in the city leadership had gone and looked at particular medians that were three foot wide and said, yeah, these are dangerous. Now, in this case, you're relying in large part for both A, B, and C, for comfort. What is there in the summary judgment record that would suggest that industrial design for comfort is a benchmark for the safety of people standing there on a median for safety akin to the very specific evidence elicited in Evans that looking at particular medians saying that median is dangerous? I'm not sure that I understand this, the huge import of Ms. Lozano's testimony. Well, Your Honor, Why is that similar? We, first of all, we strongly disagree with the district court's focus on the issue of comfort. What Ms. Lozano said was that the standard provides for a safe and comfortable place for pedestrians to use while walking. There's no question that the NACTO guidelines is what they're called are designed for safety. It is a safety regulation or guideline, I suppose, that talks about pedestrians trying to make a safe street crossing. And the city determined that this is a reasonable guide because, at least before Evans came along, it was hard to imagine any other way to determine what is a safe distance. And so it looked to the NACTO guidelines and that was a reasonable place to look to determine what would be a safe place for pedestrians to remain on medians. Your Honors, I see that my time is winding down. I'd like to reserve the remainder of my time for rebuttal. All right, counsel. Good morning, Your Honors. Good morning, Mr. Attler. May it please the court, my name is Jamie Santos and I represent the plaintiff's appellees in this case. Rhonda Brewer, David McCoy, Mario Grady, and Marissa Elise Sanchez use Albuquerque streets to make donations to those in need, to solicit donations, to meet their daily needs, and to communicate about war and economic injustice. These are three of the most cherished forms of free expression protected by the First Amendment. And if the plaintiffs lived in Santa Fe, they would be able to do this freely as long as they didn't engage in any dangerous behavior like jaywalking or darting into traffic. But Albuquerque has effectively shut down its roadways to this type of free expression because, in the words of the the law's chief architect, Chris Melendrez, it's more helpful and easier to enforce an outright ban on allowing people in the roadways or near the roadways at all than it would be to target dangerous conduct. And I would like to start with Judge Bachrach's question about design guidelines because that's something that the city has leaned on heavily throughout this litigation. But there's no design defense to the First Amendment. Those who are providing design guidelines are looking at urban designing. They're looking at maximizing the government's interest in safety, in effectiveness, and in efficiency. But the city isn't allowed to pursue those goals at all costs when doing so imposes a burden on free expression. We know that the city has to be the trustee for traditional public fora like medians and sidewalks and streets. And so it has to take into account and balance First Amendment interests when it decides how to run its city. So it can't simply look blindly at design guidelines and invoke them as a reason to close down free expression. Go ahead, please, Judge Bachrach. Please go ahead. Okay, I apologize. But Ms. Santos, my question is, in your briefing, you had characterized this as somehow an argument that it's counter to the whole notion that medians are a non-traditional or a traditional public forum. And I don't think that's what Mr. Adler, at least that's not how I've interpreted their argument. What I've interpreted their argument is much like he just said a moment ago. And that is that like Evans, where you had anecdotal evidence of people looking at three foot wide medians and saying those are dangerous, that here you don't have that sort of specific evidence. But what you do have is equivalent evidence that people said, just as he said it just a moment ago, for safety as well as comfort. The expert, design expert said that a median in Albuquerque should be at least six feet wide. So why isn't that part what he just explained an equivalent benchmark for the median band? Well, your honor, I agree with you that I don't think the city is mounting a forum analysis challenge as it did in the district court. But by invoking these design guidelines and saying essentially that if a particular part of the roadway, which we know is a traditional public forum, if that is not designed for pedestrians to stand in, or it's not designed for pedestrians to use to engage in physical exchanges, then we can all together prohibit pedestrians from being in these locations and using them for free a traditional public forum by government PR. I think that's the point that I'm making. And I wanted to also get to a point that Judge Holmes asked in his discussion with Mr. Adler. And that's about the less restrictive alternatives. I think that the Supreme Court's decision in Thompson versus Western States Medical Center is really helpful on this score, because what it says is that, sure, there doesn't have, you don't have to use the very least restrictive alternative. We know that from Ward, but the court said the existence of a whole obvious slew of available alternatives is indicative that the law was more extensive than necessary. And I think Ward was looking at something very specific. It was looking at a court of appeals decision in which the court held that you have to use the least restrictive means under intermediate scrutiny. And the court said, no, no, you don't have to do that. This is not strict scrutiny. But it never said that you, that there's any instance under intermediate scrutiny where you should ignore readily available alternatives. Well, I mean, the language of Evans says, it may be helpful. I mean, helpful implies you don't necessarily have to do it. And so I, what I'm trying to understand is how that harmonizes with, and I think that's part of our task to harmonize that with McCraw, in which there appeared to be language that arguably required at least consideration by the city of some less restrictive needs. And so what do we do with Evans from your perspective? And how do you read that? Absolutely. And I'll say two things about the kind of Evans-McCraw situation. And I won't pretend there is no tension between those decisions. And I'll note that I know that in Evans, there is a pending cert petition. But what I think is that if this court believes that there is significant tension between those decisions, it has to look also at the fact that this court has, in case numerous cases preceding Evans, looked at an invalidated speech restrictions based on the existence of readily available alternatives that were not tried. So in Doe versus city of Albuquerque, the court looked at a ban on allowing convicted sex offenders in public libraries. And it said that that ban failed to the narrow tailoring test, because there were a whole bunch of options that the city could have done short of a ban, but it didn't. The same thing in IMatter Utah versus New York, or however one pronounces that, the city said, you've got this parade permit requirement, and it certainly advances the government's interest in fiscal responsibility. But you haven't told us why existing tort law and that same goal without restricting speech. So we think before Evans and after Evans, the court has always looked at the existence of available alternatives. And to the extent Evans is inconsistent with that, it's because it would be an anomaly in the case law, not something that should have to be fit in. The second point I wanted to make about Evans is, I think that the way the district court looked at that case here, and the way the court did in McCraw was pretty similar. It said it was faced with a plaintiff who wanted to stand on a 17 inch piece portion of a median, when he could have moved down 10 feet and stood in the same location. And so the burden on speech was slight. And so that the government had to maybe do less legwork to justify that restriction. And what McCraw says is that when the burden of speech is severe, then the government has to do a lot more legwork to prove that it's that the government is essentially not trying to use a And here, I think this case is more restrictive on speech than either Evans or Oklahoma City. But let me stop you there. To some extent, that's consistent with Mr. Adler's argument, because the you're saying that when when the burden is severe, then you have to do more legwork, which means you have to do more consideration of least restrictive alternatives. But the antecedent point that that I'm trying to get at is whether you have to consider these least restrictive alternatives at all. In doing your narrow tailoring, helpful does not mean you have to. Helpful being the word in Evans. So is it your point that if you look at the broad swath of our case law, it would suggest that there is some role, some role in every narrow tailoring and then depending on the burden on speech that will determine how much of a role. I think that's exactly right, Your Honor. And I think I wanted to respond to it. And it comes from the city supplemental brief, which kind of for the first time argued that the city had looked to rest less restrictive alternatives. I want to talk about it in its reply brief. Did it not? I mean, it alluded to less restrictive alternatives and its reply brief refers you back to the reply brief. Right. I don't think it really sets forth the affirmative argument as much as in the supplemental brief about what the city did. And I think it's really critical to look at what the record actually shows, because, for example, in the supplemental brief, the city says that the city looked at just imposing the ordinance in certain locations. And if you look at the when we asked, did you look at imposing this ban just on certain locations? He said, quote, briefly, at best, that is not serious consideration of alternatives. The second evidence that the city marshaled in its supplemental brief has to do with consideration of existing laws. And I would urge the court to look at pages 426 to 434 and pages 707 to 710 of the appendix, because when Mr. Melendrez was asked about this, what he said is that he looked at the existence of other laws on the books and he described it as essentially a box checking exercise, as if to say jaywalking. Yep, we have one of those. But he he decided that those laws weren't enough because what the city wanted was to place certain locations, quote, off limits. He said that on page 710, and it wanted to do that instead of target dangerous conduct. That is exactly the type of calculus that McClellan and McCraw and the First Circuit in Cutting versus City of Portland all prohibit. That's not a calculus that the that the city's constitutionally permitted to make. So the box checking exercise, you take it, I take it you don't view as being consideration within the meaning of McCraw. I think that's exactly right. And and let me explain why, Your Honor, it's because I think the the consideration of alternatives is not a process requirement. It's not about saying, if the city satisfies elements A, B, C, D, and E, then it can enact a speech ban. What that entire requirement is supposed to get at is what the Supreme Court said in Thompson, which is, if the First Amendment means anything, it means that regulating speech must be a last, not a first resort. And so I think what this alternative consideration, a requirement gets at, is the idea that if the city tries alternatives, like cities across the country have done for decades, protecting pedestrian safety while allowing panhandling and leafletting on the roadsides, it will actually be able to address safety concerns that exist. Well, McCraw didn't use the word try. It didn't say you have to try. It said you have to consider them. Right. So I do think there's some question about whether you have to seriously consider it or whether you have to try. I think the way I would resolve that is to look at cases like Ward, which actually in that case, it involved a sound ordinance. It required concert goers in Central Park to use the city's sound tech and sound equipment rather than using their own. And the city said, or the Park Service said, we considered just having a decibel ban, but it was clear that wouldn't be effective because the impact of decibels on nearby neighborhoods depends on things like foliage and weather. So I think if you seriously consider and give a really good substantive reason for not actually trying an alternative, that would probably satisfy it. But a cursory explanation, which is it's easier or better or more effective to ban speech than target wrongful conduct. That would not satisfy the First Amendment. Let me understand. Let me understand your position on the landscaping restriction. That's part of C. We upheld such a restriction in Evans. I'm not. It's not clear to me why we shouldn't uphold such a restriction here. Well, thank you for letting me address that. Your Honor, the landscaping restriction. And I think that this court's cases show that it takes every case on the record before it. So even in Doe versus city of Albuquerque, the court said, you know, it's possible that the city could have justified this ban, but it didn't present any evidence here. So it hasn't done so. I think when you look at the landscaping ban, it fails on two fronts. One is the front that was discussed in McCraw. There is no evidence in the record, no data, no anecdotes of any concrete safety issue that this active environmental versus town of Castle Rock requires. If you can't show that, you don't even move on to looking at whether a ban is a narrowly tailored solution to that concrete harm. And then I think if you look at once you would apply the narrow that further narrow tailoring test, I think it does ban an enormous amount of speech that has not been shown to be harmful. Well, why is it any different in Evans? And in Evans, the concrete harm was a tripping issue. The notion was that if you didn't have paid medians, that there was a tripping consideration and that that was common sense in Evans. I didn't see anything in the language there that was expansive about them speaking beyond, I think somebody saying, some officers saying it was a tripping issue. Why didn't that apply here? Well, I think that that this court's decision in active environmental speaks squarely to this common sense issue. And I like content. That was a content based case too. Well, it was a commercial speech case, which the court said in McCraw is analogous to the narrow tailoring here. But what the, and what the court said in that case is that common sense and anecdotes can sometimes be enough, but it is the government's burden to show a concrete harm that would be remediated. And when there is readily available data in the record, belying that notion, then relying on common sense and anecdotes isn't enough. So what is the readily available data? And what I'm trying to do is, you know, we can't negate Evans. And so Evans upheld it. I didn't see any great data being charted out there to explain why it should be upheld in Evans. So tell me why these two cases can be harmonized. Absolutely. If I can, may I take 30 seconds to answer? Thank you. So in Evans, there was no record, no readily available data showing whether there was a concrete harm either way. In this case, in contrast, the city produced 401 collision reports in during the litigation covering all pedestrian collisions in the city over a four year period. There was not one report that provided an example of anyone tripping or becoming injured in landscaping. So in Evans, it was enough because common sense and anecdotes were sufficient. They weren't belied by the data here. There's readily available data showing that the real harm in Albuquerque is from lawfully crossing the street. 50% of the incidents involved lawfully crossing the street, which the city has not yet criminalized. And there's no examples of ramps, no examples of landscaping. So I think that's what makes this case different. Thank you, your honors. Thank you, counsel. Mr. Allen. Thanks, your honors. Getting to the point that was just being discussed regarding the data and in support of the landscaping issue. Your honor, in the active case, the court, I believe in footnote 11, cited to a case called Luce versus Towne Campbell. And I think that's a good case to look at in terms of a good discussion about how the Supreme Court has never required a empirical support for all time, place, and manner restrictions. I disagree about what the record shows in terms of the set of data that Ms. Santos was referring to. There were specific discovery requests that generated those reports. It was not an empirical study. Your honors, moving on to the... Can I just make sure I ask one question? And this relates to C-3. That's sort of a unique provision that would essentially, if I understand it, authorize the traffic engineer to make a designation of unsafe spaces. And my question to you is, are you aware of any case that has ever litigated the First Amendment validity of such a designation provision? Because if I understand it correctly, it's saying traffic engineer prospectively can say, this is unsafe. And I would say, your honor, the safeguard that's built into that provision is that it must be based on an identifiable safety standard. Yeah, but unchallengeable by anybody in the future. I mean... My time has expired. May I briefly answer and conclude? It certainly could be challenged on an as-applied basis moving forward. The plaintiffs in this case raised no challenge to it. And because I think the ordinance was stayed in this case from the outset, there is no example of this actually happening in this case, but it could be challenged in the future. Your honor, may I have 30 seconds to address less restrictive means? You can have 15 seconds to address it. Please go ahead. Just quickly to say that even if less it was considered here, and the only reason it might be described as box checking is that the alternatives were not fully coextensive with what the provisions of this ordinance, the less restrictive means must burden substantially less speech and be equally effective. Your honor, for all these reasons, we ask the court to reverse the district court. Thank you very much. Thank you, counsel. Thank you for the excellent arguments. Both cases submitted.